The next case is Consolidation Coal v. Workers' Compensation Comm'n 509015A. Counsel, please. May it please the Court, Mr. Brazor. My name is Sherilyn Brazor. I'm here on behalf of Consolidation Coal Company. The fact portion of this case has been set forth in our briefs, and unless there were any questions with regard to the facts, I'd like to just move on to the arguments to try and save a little time. The issue on appeal in this case is the Commission's finding of coal workers' pneumoconiosis and that timely disablement was made. If you look at the Commission's decision, what you will find is that there was no credibility finding made by the Commission. They simply came to the conclusion that Mr. Colbreth had coal workers' pneumoconiosis and COPD. So by that statement, we will infer that they have found Dr. Kahn and Dr. Alexander to be more credible. The reason this becomes an issue is because Section 1F requires them to prove that they've been disabled for two years of their last date of coal mine exposure, which was June 23, 2000 in this case. Dr. Kahn examined Mr. Colbreth on November 23, 2004, which was over four-plus years after he left the mine. And what the Commission and the arbitrator seemed not to notice or to ignore were the medical records that were placed in evidence in this case. They make reference to a sign of shortness of breath, which in medical records was in 1997, and the treating physician blamed it on smoking. There was no reference to his job, even though he was clearly a coal miner. The second issue with regard to the 1F finding is Dr. Kahn's opinion that Mr. Colbreth had coal workers' pneumoconiosis when he left the mine is actually rebutted by a film that was taken by the petitioner's treating physician and read by radiologist Dr. Meeks on December 7, 2001. And directing the Court's attention to this record, which was C-400, the findings on that film specifically stated there are no significant lesions of the lung or hilum. There are calcified granulomas of the left lung. There are no significant lesions of the heart or freight vessels. There are no lesions of the remainder of the mediastinum or the pleura. Impression, normal study. Dr. Kahn never looked at this record, never looked at this film, never looked at any of Mr. Colbreth's pulmonary function records or even his treating records, and for him to come to the conclusion that he had this condition when he left the mine when there was evidence indicating otherwise that was never read by any bee reader is somewhat of a question. In this case, the majority affirmed the Arbitrator's decision. They did not add anything further to it. There was a dissent filed and specifically found that the 1F requirements were not met in this case based on the medical evidence of record. The only people that the Arbitrator and the majority found credible were the petitioner and his friend Mr. Sullivan, which interestingly their testimony was also rebutted by the medical records because it wasn't a case where there were no medical records for this time period. There are records that come in and basically say he did not have shortness of breath, he did not have shortness of breath, but yet he testified at the hearing he had shortness of breath and so did his friend. I mean, it's up to the commission to make the credibility finding, but when you've got objective treatment medical records saying the complete opposite with regard to both pneumoconiosis and symptoms that the commission is going to rely on in making its findings, it certainly comes into play when they never come right out and say we found Dr. Kahn to be more credible than Dr. Tudor. I mean, we don't know. The qualifications of the experts, obviously the two bee readers were equally credentialed, both were bee readers, board certified radiologists. The two IME physicians were Dr. Kahn who did not have any qualifications specifically with regard to pulmonology and a board certified pulmonologist was Dr. Tudor. So I think if you look at the sum total of the evidence, even if you take out our expert opinions, that the decision is against the manifest way of the evidence simply because they do not bother to address the objective medical records which clearly states something to the contrary. With that said... Where did he get the COPD that Dr. Alexander found on February 22nd of 2003? Where do you get the COPD? Where did he get the CWP that Dr. Alexander found on February 23rd? Where did he get it? If he actually has it, he would have had to have gotten it from the mine. Certainly, but we're not disputing that he got it from anything else. But it is certainly irregular that you would have a film taken a year and a half after somebody left the mine that has absolutely no evidence of anything remotely close to being diagnosed with co-workers' pneumoconiosis. Who analyzed that film? I'm sorry? Who analyzed that film? Do we know? Dr. Meeks. And what are his qualifications? They are not in the record. Is he a bee reader? His qualifications aren't in the record, Your Honor. No, no. But we do know Dr. Alexander, so don't worry. He is a bee reader. Well, we also know that Dr. Wyatt was a bee reader and a board-certified radiologist, too. So, I mean... Weight and credibility. Where are we going with this? Weight and credibility is simply a matter of looking at all of the evidence and seeing if the inferences that were made by the Commission were reasonable. And what we have asked this Court to look at is if that inference is reasonable, given the fact that the medical treatment records certainly state evidence that is contrary to the findings that were made by the Commission. Because there would be no reason for him to go in and lie to his treating physician that he was trying to get treatment from. The second issue on review is the issue of Section 19D. And 19D is a provision which basically states... I'm sorry, just going back one other thing with regard to the Commission's decision. They make a point of finding that Mr. Colbert had a restrictive condition in 1997. Scientific principles and even the petitioner's brief concedes, you know, colorectal pneumocardiosis is a slowly progressive, permanent condition, and obviously the restrictive condition is not evident when testing is taken after he left the mine. That's another tiny piece that goes into the puzzle to, gee, was this really a correct finding? And moving forward to the 19D issue, the provision basically states that if an employee acts in a manner that is going to persist in an unsanitary or injurious practice that tends to imperil or retard his recovery, the Commission may in its discretion reduce or suspend compensation to such an employee. In this case, the Commission flat out said Section 19D was inapplicable. This is a case that Mr. Colbert filed with specific intent to receive benefits for a pulmonary condition. Mr. Colbert had a smoking history that was substantial, to say the least. Dr. Kahn himself testified that he had patients who had similar smoking histories who'd never worked at a mine and had test results that were the same. His own treating physician was obviously advising him to stop smoking in 1997. Dr. Tudor testified as to the detrimental effect of smoking on the lungs. And for the Commission to come to the conclusion that Section 19D is inapplicable seems contrary to law. It's a statute. It's under the Act. It's not inapplicable. I mean, if they'd like to say why it's inapplicable, their statement was, Petitioner's occupational disease need only be a causative factor in his resulting disablement and testing will not discern the etiology of a defect. The first part of that sentence is specifically from the Supreme Court decision that was issued in Fitz, which basically said we're not going to award somebody benefit piecemeal. If they've got a disabling condition and it came from more than one spot, we're going to award them for the full disability. We're not going to take it out just to see smoke. Fitz did not address Section 19D. And to say that Fitz is going to trump a statute, I appreciate the wisdom of the Supreme Court and their statements. However, when you've got a statute that says something completely to the contrary, then you kind of have to question the basis of the decision that was made. Let me ask you a specific question. Kahn testified that damage to the claimant's lungs was permanent in nature. Tudor also testified there's no cure, as we know, for CWP. So while your argument has some, I think, logical appeal in the real world, is there really any evidence or testimony in the record that the smoking the claimant did would have delayed or threatened his recovery? I mean, is there any specific testimony that says that other than what we know about smoking in general? Well, it's not going to impede your recovery because there's no recovery for either condition. If what you're saying is correct, that he does have co-workers in McConaughey, that he does have COPD, they don't go away. But to, I mean, it's the equivalent of awarding somebody a repetitive trauma claim and then saying, oh, I sat at home and I turned this knob on my washer 800 times every night to not think that it might have gotten worse after you already knew it was a problem. In this case, the evidence shows his treating physician flat out telling him he needs to stop smoking in 1997. Isn't that the normal advice that physicians give to people? Stop smoking? I never have any doctor today who says you should continue smoking. I would agree. I just do not see how the commission can come to a conclusion that a statute that says that somebody is consisting in an injurious practice which tends to imperil or retard his recovery, he's certainly not going to make his condition any better if he keeps smoking. So I think you can take that point. Then it can suspend the compensation. To say that's inapplicable on a pulmonary case is unbelievable. Is there any recovery here? Well, I mean, there's nothing in the record that's going to say he's going to be recovered. But I mean, we all go home and we watch TV and see Sporiva commercials and we see other things. I mean, I don't know if there's a recovery. There's nothing in the record. But you're basically going to, you know, you have three physicians who have all stood somewhere in this record and said, hey, this is bad, and gee, if you're doing it, it's going to get worse. And that's what he does. And then he files a claim for benefits for a pulmonary problem and says, oh, look how bad I am. And because I'm so much worse now, pay me more. I mean, if any case was ever one out there where 19D would be applicable, it would be a pulmonary case where somebody works in a mine and continued to smoke up to the hearing date. It's not like he quit when he filed his claim for benefits and thought, well, you know, this is probably going to look kind of bad. No, he's still smoking at the hearing. And it's a pack and a half a day. You know, they say, oh, he must have fallen off the wagon. Well, that's a pretty big wagon. Help me out. Maybe I'm not thinking clearly this afternoon. But he gets an award for CWP, okay? Mm-hmm. Okay. Is he going to get more of an award later on because he continues smoking? No, he's not going to get more of an award. Well, unless he filed, I guess, filed suit against a cigarette company. No, but I meant under the scheme. He's not. Well, that's not necessarily true, Your Honor, because these are man-as-a-whole awards. Let's say he got recalled back to the mine, which is somewhat unlikely. I do believe Mr. Culperin is in his 70s by this point, but I don't think it's very likely with this case. He could go back to the mine. He could go to a different mine and go work there. And there is going to be no credit for whatever the award here is if that were to happen. So, yeah, I mean, technically, very, you know, if you're talking about a closed mine and somebody is 45, 46, and they get an award, and then they suddenly get recalled back in when they're 50, there is no credit. This is man-as-a-whole. We don't get anything. There's no body part lung that we get to credit somewhere down the road. So, yeah, presumably if someone keeps smoking and actually went back into the mine, it would get worse. Plus, if they were to file, let's say, that we get all done here, and in six months after we finish all this up and we pay all the benefits, they turn around and file a 19G petition. Oh, I'm worse now. My lungs are even worse now. Okay, so only through the 19G, possibly. Yeah, it's happened. So, yeah, it can happen and it does happen. I'm just saying that sometimes the argument is like, well, let's parse this out, that his present condition X amount is attributable to this injurious practice he engaged in for how many years, and Y is the amount that we could say is exposure to dust, silica, all of that. Okay? That's an occupational, personal versus occupational. And apparently we're not doing that, but are we doing it now presently almost in a retroactive parsing penal situation? I don't think it's being done, Your Honor. I mean, we had cases, you know, that have gone up that had both and got whacked big time, 70% as a whole, and smoking. So, yeah, it's a matter of the commission determining what they think the amount is or the arbitrator or, you know, and the commission affirming it or whatever. But the bottom line here is, you know, we cannot – there is no way to prove that his coal mine dust caused the DCOPD any more than there is to show that it's cigarette smoking. And it's a question of which, you know, if it's both and it can't be parceled out, you know, should there be some credit because somebody smoked a pack and a half a day for 45 years? Yeah, I think so. Because I think there's more evidence showing that somebody cigarette smoking is going to be more damaging than being in a mine. But, you know, Mr. Besor may have evidence that says the exact opposite. So, you know, with that said, the problem we have is the fact that the commission flat out said it was inapplicable. And I don't find any reason to make a determination that a statute is inapplicable when you're dealing with a pulmonary function case and he's a smoker and all of the doctors in the records have said this is not good for you, you need to stop, and if you don't, it's going to be worse and you have to stop smoking. Thank you. Counsel, please. May it please the court. Mr. Trevally, my name is Bruce Besor and I represent Raymond Culbert. In listening to your questions, I'm not trying to argue Mr. Trevally's point, but I'm trying to think is there a coal mine lung disease where 19D could apply? And I'll get as close as I can. Let's say you had a man that never smoked at all and he got chronic bronchitis, not pneumoconiosis, which is incurable, not emphysema, but chronic bronchitis. And the medical testimony believed by the commission was that chronic bronchitis from coal mining could resolve in a few years. But then he started smoking because he didn't want it to resolve. He wanted to get a bigger award. Well, it may have an application there because in that case, you may have a mine-induced lung disease that could have gotten better. A man who you're not taking as you find him started smoking after he left the coal mine to retard that recovery. But the point is, coal worker's pneumoconiosis isn't that way. It can't get better. And as I look again at that evidence and I try to find what case could it apply to, then I'm brought back to this case to say, well, there has to be some evidence in this case to support the respondent's argument. And there isn't any. What evidence would they need? They'd have needed some doctor to say you can recover from coal worker's pneumoconiosis. They needed also to have somebody say that his smoking stopped it. I think he would have recovered, but his smoking stopped it. And then he'd have also needed to show that he did his smoking so he wouldn't recover. He started that smoking after he left coal mining. At least that's 19D as I see it. Consol's arguments are based on manifest weight, and there's support in the record for each of the commission's rulings, and the commission's decision should be affirmed. This is not a complicated case. We head right into that 19D argument. And Consol did state the law properly. If the miner persists in practices that imperil or retard his recovery, or if he refuses medical, surgical, or hospital treatments reasonably essential for that recovery, then the commission may, in its discretion, reduce or suspend the compensation. They may in their discretion. In this case, they did exercise their discretion, they didn't reduce or suspend the compensation, and the commission said why. Consol doesn't like that decision. Mr. Culver started smoking at the age of 16 to 18. He was smoking before he started mining. He was smoking before he got his pneumoconiosis, and obviously before he got his COPD. The coal mine takes that employee as a finder. And there's no evidence that Mr. Culver started smoking in order to imperil or impede or retard his recovery from pneumoconiosis or from COPD. Or that if he'd stopped smoking when he left the mine, he would have recovered from his pneumoconiosis and COPD. Consol specifically argues that the only fine the commission made with regard to 19D was that it was inapplicable. Well, that's just not true. The commission also said the occupation disease only needs to be a causative factor in the disablement, and testing won't tell you the cause of the defect. And in those words, the court can see that the commission knew that no matter what happened with any continued smoking, there would always be a part of the COPD caused by mining, always part of the pneumoconiosis caused by mining. So the mining would always be a causative factor in this man's disablement. The commission was also saying that any attempt to apportion the smoking part of the COPD from the mining part would just be speculation because there's no objective way to separate the two. In fact, there isn't even any subjective evidence in this case, nothing for Consol to base his argument on because no doctor even tried to apportion. And on top of that, when you take the language of 19D apart and try to apply it to pneumoconiosis and smoking, it can't apply by definition because, as we said, you can't recover from it. It can do one of three things. It can stay the same. It can get worse. It can get worse even after you leave the mine. Second, smoking doesn't cause pneumoconiosis, and smoking after you leave the mine can't affect the course of that pneumoconiosis for good or ill. Pneumoconiosis is scarring. Smoking damages emphysema. One is a restrictive disease of the lungs, scarring, can't open up. The emphysema is you can't expel the air. They produce different things. Now, let's talk about pneumoconiosis. Now, the COPD complicates it a little bit, but it's pretty much the same story. COPD can be for multifactorial causes, and when it is, the effects of those causes are additive. COPD by its name is chronic and progressive, and generally, like pneumoconiosis, you don't recover from it. The part that's caused by mining should progress after you leave the mine, regardless of smoking. The part that's caused by smoking should progress regardless of whether or not you leave the mine, and there's no reason to think that quitting smoking will cure the part of the COPD that was caused by mining, or that quitting mining will cure the part that was caused by smoking. If a miner has COPD, and it was caused by both, and he continues to smoke after he leaves the mine, there's no reason to think that it has anything to do with the part of the COPD that was caused by mining. Now, I want to draw the ballpark for pneumoconiosis, COPD caused by mining, and the precision of our PFTs with the testimony of Dr. Tudor. He described what pneumoconiosis is. He says it is a tissue reaction to the trapped coal mine dust that's called scarring or fibrosis, and it's associated with a kind of emphysema. So you've got the dust encased in the scar with a halo of emphysema around it. He also said that that scarring of pneumoconiosis can't perform the function of normal healthy lung tissue. So by definition, when you have pneumoconiosis, you have an impairment in the function of the lung. He said from the side, he said that pneumoconiosis is an x-ray diagnosis because you can have it radiographically and still have normal physical exam of the chest, normal PFTs, normal blood gases, and no pulmonary complaints. Now, whether it's restrictive or obstructive, he said that when a person has scarring in their lungs, that primarily ends up with a restriction. But emphysema in any of its forms, if it's significant enough to cause a major pulmonary function impairment, will be an obstruction. So with pneumoconiosis, you've got to hope. You've got the emphysema. If there's enough of it to cause obstruction, you've got the scarring. If there's enough of that, it'll cause a restriction. There was some talk earlier about the 1997 PFTs that showed restrictive PFTs. If you look at those PFTs with the more recent ones, you'll see they're slightly abnormal. All three are slightly abnormal. And that relationship between the FEV1 and the FVC tips it to whether it's restrictive or obstructive. The doctor thought it was restrictive in 1997. Kahn and Tudor found it to be obstructive more recently. The point is it was abnormal each time. Now, Dr. Tudor also, when he says that smoking is the only thing that caused this man's COPD, he said, quote, My position is that the inhalation of coal mine dust can produce a clinical picture of COPD that's very similar, if not identical, to that which is produced by the inhalation of tobacco smoke. In other words, Tudor said, if you've got COPD from smoking or COPD from mining, they both look identical. But the reason he finds that this COPD is from smoking and not from mining is the frequency that mining causes it. He believes that mining causes COPD less than 1% of the time. Well, his problem is that the Department of Labor and NIOSH and the American Thoracic Society peg it more at either 50% as much or the same as smoking. Also, he has no data. Even if he were right that COPD is caused by smoking so much more than mining, he can't point to any data why this man's COPD was not caused by mining. He also said that pneumoconiosis can result in a reduced diffusing capacity, and this man, by his measurements, has a reduced diffusing capacity. He said that if a miner has pneumoconiosis, he recommends no further exposure to coal mine dust. And on 1F, he was asked if it's possible for pneumoconiosis to first appear several years after you leave the mine, and he said, less than 5% of the time, more than 1% of the time. So the preponderance of evidence would say that if he has it at any time, he got it when he left the mine. On the precision of PFTs, he said a person can have sharpness of breath despite normal PFTs. They can have a lobe of the lung removed and have normal PFTs. They can start their career in mining with normal PFTs, lose a third of their capacity when they leave the mine, and still have PFTs in the range of normal. And last, he concluded by saying a person can have damage and disease in their lungs  They're a prudent tool. Now, the rest of these issues are manifest weight issues. There's support for them in the record. I'll go through them pretty quickly. On the issue of disease, the commission found pneumoconiosis and COPD, that the pneumoconiosis was caused by the mining, COPD caused by both mining and smoking. Those decisions have support in the record. Pneumoconiosis was diagnosed by Kahn and his bee reader radiologist, Dr. Alexander. The COPD was confirmed by the testing of both options. Kahn went on both exposures, Tudor just on smoking. The commission gets to make that decision. It's a fairly close call, and they made it in favor of the petition. Given that testimony, the commission decision passes the manifest weight test. Now, Consal has spent a lot of time in the brief, at least, on the value of the credentials of the witnesses. But it's the commission's job to decide what that credibility is. And they've seen Dr. Kahn for 20 years. They've seen Dr. Tudor for 20 years. None of this is new to them. As far as the bee readers go, they're about the same. Dr. Wyatt, Dr. Alexander, both bee readers, both board-certified radiologists. There's nothing out of line with the commission choosing Dr. Alexander. And here's where we get that domino thing. Once the commission decides that the miner has pneumoconiosis, as per the testimony of Dr. Tudor, the dominoes start to fall. Number one, he's got some functional impairment problems, whether it can be measured or not. Number two, he shouldn't go back to coal mining. He has to save money. Number three, the odds of him developing that pneumoconiosis more than two years after he left the mine, more than 1%, less than 5%. So, like I say, once you determine there's pneumoconiosis, and that was clearly within the manifest weight test by the commission, once that was made, these other issues are taking care of themselves one at a time. On 1F, the commission decision has support in the record. Tom said it would have been in existence when he left mining. Tudor says less than 5% would have developed later. One of the things in the brief that's obvious is that Gonzalo's main argument on 1F is that you have to have proof of disablement within two years. But that's not the law. You have to have disablement within two years, but the proof can come afterwards. We cited Hicks, Plasters, Monterey, and Ziegler cases to back that up. With regard to the issue of notice, the commission found that Gonzalo didn't show it was prejudiced by a lack of timely notice. That decision was proper because regardless of whether the notice was adequate or defective, in the end, Gonzalo would have to prove undue prejudice for notice to play a role. As for the decision, Gonzalo could show no prejudice from lack of notice. They had a full pulmonary exam, a doctor of their choice, a B reading by the radiologist of their choice, and a review of all the medical records. And on those medical records, one thing the commission has to do every time is decide how important they are in the totality of the evidence. I've lost cases because they thought they were more important. If Commissioner Lindsey had had this case, I would have probably lost this case, but I didn't. This commission thought the medical records were not the most important thing, but that's something that happens on a case-by-case basis. This time, we won, and we should win. In terms of the extent of the award, 15% isn't an unusual award for this level of black lung claim. In fact, it's right down here. And one thing I want to say about the pneumoconiosis and COPD here is that this man has both diseases, but the pneumoconiosis alone would support all the findings of the commission and the award. I ask the court to confirm the commission's decision. Counsel, please, Gonzalo. Fairly briefly, Your Honors. The commission did not say that COPD was caused by coal mine dust and smoking. If you look at their very first finding in their decision, that is not what the arbitrator said. He said it was from coal mine dust. There's nothing in there about smoking. Second of all, the argument with regard to, oh, it was a restrictive condition in 1997, and now it's an obstructive condition, and it's all by age, none of that's in the record, Your Honors. I think we need to stick with what's in the record, which leads me to my final point here. And the majority of Mr. Rezor's argument was based on testimony from Dr. Tudor, not Dr. Kahn. The commission didn't accept the opinion of Dr. Tudor. In fact, they specifically chose Dr. Kahn. And it's somewhat compelling that we're now going to rely on Dr. Tudor's testimony to make the case when Dr. Tudor did not find coal workers' pneumoconiosis and did not find that the COPD was related to smoking. So if we're going to rely on Dr. Kahn for his other findings, then I think we need to stick with what Dr. Kahn stated with regard to those findings. And what you will find is that Dr. Kahn's testimony just controverted almost everything that Mr. Rezor said. He stated that the only way a coal miner will develop an obstructive condition from working in the coal mine is if they are a smoker as well. That is found at C107 in the record.  He just told you that you can get it from just working in a coal mine. Or you can just get it from smoking. That's not what his expert said. But we're supposed to believe his expert with regard to everything else. And he said there's no subjective evidence in the record to say that any part of the COPD was by mining. No, Dr. Kahn stated he had patients who were not coal miners and smoked for 41 years, C109. He agreed that some of those patients had comparable pulmonary function tests as those found in Mr. Colbert. That to me says it just as easily could have been smoking as it could have been from the coal mine dust. And based on Dr. Kahn's opinion, the only reason he has COPD due to smoking or coal mining is because he was a smoker. You need to look specifically at that statement that he makes on page C107 of the record. You are only going to get an obstructive condition if you work in the mine and you are a smoker. And he was a smoker. And he continued to smoke after he left the mine for another six or seven years before it went to hearing in front of the arbitrators. 19D is applicable. If we're going to rely on Dr. Kahn and say that he's the most reasonable and it's not against the man's best way of the evidence, then we have to base it on what his opinion was. If you want to base the decision on all of Dr. Tudor's opinions on how pulmonary works and restrictive and obstructive conditions and all of the findings, then we kind of have to accept what he decided, which was there was no coal workers pneumoconiosis and COPD was related to smoking only. To make the argument out of the respondent's expert opinion, when your own expert said something to the contrary, to back up the decision, is unbelievable. I mean, his physician testified. He didn't testify to what was consistent with the law at this time. And the NIOSH, the Federal Register and the statements from the Federal Black Lung that Mr. Besor wrote, that's out of it. So, Your Honors, the opinion does not withstand review under the manifest way of the evidence under the finding of Section 1F, coal workers pneumoconiosis, and specifically with regard to 19D. Thank you. We'll take the matter under advisory.